**SLIM OLSON, Inc.**
v.
**NATIONAL ENFORCEMENT COMMISSION et al.**
Civ. A. No. 4175–53.

United States District Court
District of Columbia.
Feb. 19, 1954.

Carl S. Hawkins, Washington, D. C., for plaintiff.

Rufus E. Stetson, Jr., Asst. U. S. Atty., Washington, D. C., for defendants.

HOLTZOFF, District Judge.

This is an action for an injunction against members of the National Enforcement Commission to restrain them from entering a final decision against the plaintiff, or from issuing a certificate disallowing certain payments of wages said to have been made in violation of the Defense Production Act of 1950. The controversy is before this court on cross-motions for summary judgment.

The plaintiff Slim Olson, Inc., is a concern engaged in the sale of gasoline and gasoline products at Bountiful, Utah. At the time involved in this case, it had about twenty-two employees, mostly station attendants and truck drivers. In 1950 and 1951 it granted wage increases to its laboring men. The plaintiff was then haled before the Economic Stabilization Agency on an accusation of having made these raises in violation of the Defense Production Act of 1950, 50 U.S.C.A.Appendix, § 2061 et seq. The National Enforcement Commission, which is one of the tribunals of the Economic Stabilization Agency, decided that the aggregate wages paid in excess of the amounts permitted by law and regulations, from January 15, 1950 to and including May, 1952, equaled $6,509.-44. As a penalty the Commission disallowed double that sum, i. e., $13,018.88. This decision was made on May 21, 1953. The effect of the penalty, if enforced, is that the last mentioned amount would be disallowed by the Bureau of Internal Revenue in calculating the deductions to which the plaintiff is entitled under the Revenue Laws.

This action to enjoin the enforcement of this decision was then brought. Numerous objections to the validity of the authority and the legality of the decision of the Commission were raised. One of them was that the pertinent provision of the Act is unconstitutional. In the light of the fact that this objection was interposed, a three-judge court was convened. That tribunal reached the conclusion that there was no substantial constitutional question, and accordingly the three-judge court was dissolved and the matter was remitted to an individual judge for determination of the remaining issues.

While a number of contentions are advanced by the plaintiff, only two of them

merit serious consideration. The first is that the power sought to be exercised by the defendants had been terminated by express provisions of the Defense Production Act of 1950, at the close of April 30, 1953. The second objection is that the statute does not authorize a disallowance in any amount greater than the actual excess payments, and that if it were construed otherwise the Act must be deemed unconstitutional as depriving the plaintiff of due process of law and specifically of his right to a trial by jury.

Before considering these two contentions, it seems helpful to review briefly the pertinent provisions of the statute and the regulations. The Defense Production Act of 1950, Title IV, § 403, Act of September 8, 1950, 64 Stat. 798; 50 U.S.C.A.Appendix, § 2103, authorized the President to impose wage controls. Section 405(b) of the Act, 50 U.S.C.A. Appendix, § 2105, provided that no employer should pay and no employee should receive any wage, salary, or other compensation in contravention of any regulation or order promulgated by the President. It continued as follows:

"The President shall also prescribe the extent to which any wage, · salary, or compensation payment made in contravention of any such regulation or order shall be disregarded by the executive departments and other governmental agencies in determining the costs or expenses of any employer for the purposes of any other law or regulation."

Section 717 of the Act, 50 U.S.C.A. Appendix, § 2166, provided that the Act and all authority conferred thereunder should terminate at the close of June 30, 1952. By a later amendment this date was changed to April 30, 1953, in respect to Title IV of the statute. Section 717 further provided that any agency created under the Act might be continued in existence *for purposes of liquidation* for not to exceed six months after the ter-

mination of the provision authorizing the creation of such agency.

The Act furnished two judicial remedies for its enforcement: a civil suit for an injunction, Section 409(a); 50 U.S. C.A.Appendix, § 2109; and a criminal penalty for any willful violation, appropriate proceedings to that end to be brought under the direction of the Attorney General, Section 409(b), 50 U.S. C.A.Appendix, § 2109(b).

By an Executive order the enforcement of the provisions of the Act relating to salaries and wages, was delegated to the Economic Stabilization Agency, which, in turn, created two instrumentalities for that purpose. One was the Wage Stabilization Board and the other was the National Enforcement Commission, which acted as a reviewing tribunal.

Section 6.1 of the regulations issued under the Act contains the following provision:

"Whenever there has been a final decision in an enforcement proceeding imposing a disallowance sanction, * * * the National Enforcement Commission shall issue a Certificate of Disallowance setting forth * * * the amount which shall be disallowed and disregarded by any Executive Department or other agency or departments or agencies of the Government in determining the costs and expense of the respondent. The certificate of disallowance shall be transmitted by the National Enforcement Commission to the appropriate Executive Departments or other agencies of the Government and a copy served upon the appropriate board or office and the respondent. *The certificate of disallowance shall be conclusive for the purposes stated therein.*" [1]

The Administrator of the Economic Stabilization Agency on April 3, 1952, issued General Order No. 15, setting forth the extent and the effect of disallowances made by the Agency. Section

1. Emphasis supplied.

4 of that Order contained the following provisions:

"Sec. 4. *Disallowance policy— (a) Purposes of disallowance.* The disallowances under the authority granted by sections 2 and 3 may be made for one or more of the purposes of:

"(1) Calculating deductions or the basis for determining gain under the Revenue Laws of the United States;

"(2) Determining costs and expenses under any contract made by or on behalf of the United States, either directly or indirectly;

"(3) Establishing any maximum price pursuant to the act; and

"(4) Determining the costs or expenses of any person for the purpose of any other law or regulation.

"(b) *Amounts of disallowance and extenuating circumstances.* (1) The amount to be disallowed and disregarded shall be the entire amount of the wage, salary or other compensation paid or accrued, or the entire amount of the payment * * * in violation of the act or of any regulation, order or requirement issued under the act; provided however that where extenuating and mitigating circumstances * * * are found to exist, less than the entire amount of such payments or accruals may be disregarded and disallowed; * * *."

By the Administrator's Order of November 5, 1952, Section 4(b) (1) of General Order No. 15, just quoted, was amended to read as follows:

"3. Section 4(b) (1) of said General Order 15 is hereby amended to read as follows:

"(1) The amount paid or accrued in violation of the act or regulations, orders or determinations made thereunder which may be disallowed and disregarded shall be the entire amount of the wage, salary or other compensation paid or accrued, * * * and not merely the amount paid or accrued in excess of the legal maximum of such wage, salary, other compensation, or payment. Where extenuating and mitigating circumstances exist, * * * less than the entire amount of such payments or accruals may be disregarded and disallowed; * * *."

Thus, the statute prescribed three sanctions for the enforcement of the wage stabilization policy, two of them being judicial and one administrative First, the administrative agency was authorized to resort to the courts and apply for injunctions. Second, criminal penalties were provided. It was contemplated that for this purpose the administrative agency would submit matters to the Attorney General for prosecution. Third, the administrative sanction was that any disallowance would be binding on the Executive branch of the Government in calculating any costs or expenses of the person against whom a disallowance was ordered, and particularly in computing deductions or the basis for determining gain under the Revenue Laws. By regulations these disallowances were made binding and conclusive on the Bureau of Internal Revenue in assessing taxes. This remedy was exceedingly drastic, especially as it withdrew from the taxing authorities a part of their power to determine taxes and lodged it in the agency administering the wage stabilization policy. There seems to be no question, however, that harsh though it may be, this aspect of the regulation is valid as being within the powers conferred on the President by statute. The regulation went much further, however, by not limiting the disallowance to the actual excess payments, but providing that the amount to be disallowed or disregarded should be the entire amount of the wage, salary, or other compensation, and not merely the amount paid in excess of the permissible maximum. The validity of this provision will be discussed hereafter.

■ Before proceeding to a discussion of the merits, it is necessary to advert to a preliminary objection raised by

the Government, namely, that the plaintiff has not exhausted its administrative remedies. The court holds that this objection is not tenable. Before suit was filed, a hearing had been held by the Wage Stabilization Board, which was the administrative tribunal of first instance. An appeal was taken from its decision to the National Enforcement Commission, which was the final appellate administrative tribunal within the agency. The Commission rendered its final decision and order. Beyond this step there was no further administrative review. It was only after the rendition of the decision and order of the National Enforcement Commission that the present suit was filed. There was no further administrative remedy to which the plaintiff could resort. It had exhausted all those accorded to it by statute and regulations.

True, after the decision and order of the Commission were filed, the plaintiff presented a petition for re-hearing to the National Enforcement Commission. It was not mandatory on its part to do so in order to exhaust its administrative remedies. An application for rehearing or reconsideration is similar to a motion for a new trial. The making of such an application is entirely discretionary with the aggrieved party. If the party desires to do so, it can rest on the final decision without asking for a reconsideration. Consequently, by filing such a petition the plaintiff did not destroy the finality of the decision of the National Enforcement Commission, nor did it impair the conclusion that it had exhausted all administrative remedies.

Subsequently to the filing of this suit, the National Enforcement Commission denied the petition for rehearing. Admittedly there are no further administrative steps that the plaintiff might have invoked. The Government seems to contend, however, that this suit was prematurely brought and should have been instituted only after the petition for a rehearing was denied. In effect, what the Government is requesting this court to do is to dismiss this suit and let the plaintiff file a new complaint based on the same allegations and asking for the same relief. This court will not stultify itself by pursuing this course. It will not ask the plaintiff to begin anew. To do so would elevate form over substance and immolate substantive rights on the altar of technicalities. It would be contrary to the modern liberal spirit in which the Federal Rules of Civil Procedure were framed. Were the matter of not such a serious import, the court might be inclined to refer facetiously to Mr. Bumble's famous aphorism, which can often help to maintain a proper feeling of perspective and a well-balanced sense of proportion among members of the bench and bar.

In addition to these considerations, the court is of the opinion that the requirement of exhausting administrative remedies is not applicable to the situation presented by the case at bar. The salutary rule compelling a person aggrieved by administrative action to exhaust his administrative remedies before resorting to the courts, is well established and is generally enforced. It is applicable, however, if a Government agency is seeking to exercise powers conferred on it and the objection is raised that the action of the agency is erroneous in law or in fact. In this case the very existence of the agency has been challenged. In other words, the plaintiff urges in effect that the National Enforcement Commission has been abolished and its members have become private citizens who are intruding into the Government and usurping governmental powers that are not vested in them. Surely a person aggrieved by the action of a private citizen who is claimed to have no official status, but who arrogates official powers to himself, should not be required to submit himself to the assertion of authority before appealing to the courts. Whether the plaintiff's contention is well founded is a matter to be discussed hereafter, but if the plaintiff predicates his position on this basis, he should be permitted to resort to the courts and secure a decision in respect

to the merits of his contention. At common law a writ of *quo warranto* would lie under such circumstances. Any remedy that could have been obtained by such a writ may now be secured by a civil action.[2]

In view of the foregoing considerations, the court concludes that this action may be maintained. We proceed to a consideration of the merits.

■■ The first question to be determined is whether at the time when its decision was rendered the National Enforcement Commission had a legal existence and was authorized to exercise the powers that it sought to invoke. It will be recalled that its decision was rendered on May 21, 1953. The Defense Production Act, however, provided that Titles IV and V[3] of the Act and all authority conferred thereunder should terminate at the close of April 30, 1953. This mandate is unequivocal and unambiguous. The authority of the Commission ended prior to the time when it rendered its decision and, therefore, its attempt to act was null and void. Since its proposed certificate of disallowance, if issued, might have disastrous effects upon the plaintiff's tax liability, in respect to which no administrative review by the Bureau of Internal Revenue and no judicial review is provided, equity should extend its strong arm to stay the hands of the individuals who purport to exercise official powers that the Congress has withdrawn from them.

The Government relies, however, upon the provision that any agency created under the Act may be continued in existence *for purposes of liquidation* for not to extend six months after the termination of the provision authorizing the creation of such agency. The Commission and its counsel seem to take the anomalous position that during the period of liquidation the Commission was empowered to continue to function fully and to exercise the authority originally conferred upon it. Manifestly, such a course would completely thwart the will of the Congress, for the Congress in no unequivocal terms terminated the authority to act as of April 30, 1953. Efficient administration requires that some short period of time be accorded to an outgoing governmental agency to windup its affairs after the cessation of its functions. To liquidate means to windup. It does not mean to continue to exercise authority and to make binding adjudications. No doubt some time was required to organize, classify, and close the files and to deposit them with the proper repository; to examine the pending matters and to determine whether any of them should be transmitted to the Attorney General for further action; to audit and pay expense vouchers of members of its staff and vouchers for supplies; to determine the disposition of its furniture and equipment; and to handle numerous other matters that are involved in the liquidation or winding up of the affairs of a large organization. The activities of the Commission during the period of liquidation should have been necessarily limited to those routine matters that pertain to winding up its affairs and closing its files. During the period of liquidation it had no authority to continue to make binding adjudications under the powers originally granted by the statute.

■ The conclusion inescapably follows that the Commission was without power to conduct any proceedings or render any decisions disallowing alleged excess payments after April 30, 1953. For this reason the final decision of the Commission in this case should be adjudged to be null and void and any attempt to enforce it or to file a certificate of disallowance thereunder, should be permanently enjoined. It must be remembered that it is a duty of the courts to protect the individual against illegal encroach-

---

2. Federal Rules of Civil Procedure, Rule 81 (a) (2), 28 U.S.C.A.

3. The activities of the Commission involved in this litigation were governed by Title IV of the Act.

ment on the part of Executive and administrative officials. This principle is basic and fundamental in our form of government and in the philosophy of our free institutions.

■ The second question presented is whether irrespective of the termination of its powers, the Commission ever had legal authority to disallow any sum greater than the actual excess payment. The statute provided that the President should prescribe the extent to which any wage, salary, or compensation payment made in contravention of any regulation or order, should be disregarded by Executive departments and other governmental agencies. Again, the phraseology of the statute is unequivocal and unambiguous. The power to disregard any wage or salary illegally paid is manifestly limited to such wage, salary, or compensation payment as is paid in contravention of any law or regulation. It extends only to any amount in excess of the legal payment. Ineluctable logic leads to the conclusion that the administrative regulation providing for disallowance of the entire amount of the wage, salary, or other compensation if a part of it is paid in violation of law, and not merely the amount paid in excess of the legal maximum, is void as not authorized by statute. The power of the Commission to act, even during the period when it was clothed with its full panoply of authority, was restricted to disallowing any excess payment made over the legal maximum permitted by law, and did not extend to the entire amount of the wages paid. No intention on the part of the Congress is disclosed to vest any authority in the administrative agency to impose such penalties in its discretion and at its whim. Under this regulation if only 1% of the wages paid was above the legal maximum, the entire 100% might be disallowed. Obviously, the Congress could not be deemed to have contemplated such a harsh and unjust result. Surely if this had been the intention of the legislative branch, it would have been spelled out in express words.

■ While the statute is unequivocal and does not seem to require any construction or interpretation, it might be helpful to observe that the construction urged by the Government might well give rise to a serious constitutional question. It is doubtful, to say the least, whether power to impose discretionary penalties in an unlimited amount may be vested in the Executive branch of the government. If the disallowance were to be the result of a judicial proceeding, the party affected would be entitled to a trial by jury. A person may not be deprived of this right by a statutory device, such as is sought to be contrived in this instance. It is, of course, a well-settled principle of statutory construction that if two interpretations of a statute are possible, one of which would raise no question as to its validity while the other might give rise to controversy whether the statute is subject to a constitutional infirmity, the former construction is to be preferred.[4]

Defendants' motion for summary judgment is denied.

Plaintiff's motion for summary judgment is granted and a permanent injunction will issue restraining the defendants from attempting to enforce their purported decision, or to issue any document purporting to be a certificate of disallowance.

4. Knights Templars' & Masons Life Indemnity Co. v. Jarman, 187 U.S. 197, 205, 23 S.Ct. 108, 47 L.Ed. 139; United States ex rel. Attorney General v. Delaware & H. Co., 213 U.S. 366, 407, 29 S.Ct. 527, 53 L.Ed. 836; Carey v. South Dakota, 250 U.S. 118, 122, 39 S.Ct. 403, 63 L. Ed. 886.