**William M. YANDELL, Plaintiff,**

**v.**

**UNITED STATES, By and Through the DEPARTMENT OF INTERIOR, UNITED STATES FISH AND WILDLIFE SERVICE, Defendant.**

**No. DC80–145–LS–O.**

United States District Court,
N.D. Mississippi,
Delta Division.

Nov. 5, 1982.

Charles M. Merkel, Clarksdale, Miss., for plaintiff.

Glen H. Davidson, U.S. Atty., Oxford, Miss., Thomas W. Dawson, Asst. U.S. Atty., for defendant.

MEMORANDUM OPINION

SENTER, District Judge.

This cause came on for hearing upon the plaintiff's complaint for declaratory judgment and injunctive relief against the Department of the Interior, United States Fish and Wildlife Service, Division of Law Enforcement, and the court sitting without a jury makes the following finding of fact and conclusions of law, to-wit:

Plaintiff farms 3,000 acres of land in Quitman County, Mississippi, and brings this action seeking a declaratory judgment with respect to the interpretation of or application to him of 50 C.F.R. 20.21(i) and an injunction against further prosecution by agents of the United States Fish and Wildlife Service for alleged violation of this regulation. As the basis for this action, plaintiff alleges that for fifteen years prior to the hunting season of 1979, he had followed a practice each winter of creating upon his farm water impoundments attractive to waterfowl, and from time to time in newly created ponds he had placed grain which could be utilized by waterfowl for feeding purposes. He alleged that he conducted these feeding operations in areas remote from any areas in which hunting was undertaken and for the purpose of imprinting upon the waterfowl the location and use of the newly developed ponds. Plaintiff further alleges that on January 31, 1980, he was arrested by agents of the Fish and Wildlife Service and charged with taking migratory waterfowl with the aid of baiting, a violation of 50 C.F.R. 20.21(i), notwithstanding the fact that at the time of arrest he was hunting in a natural resting or roosting area which was removed in distance 3,700 feet from the nearest deposit of food or bait. Plaintiff alleges that he, believing the practice to be legal and clearly permissible under the regulation, has since that time conducted similar operations and will do so in the future, and he seeks from the court a declaratory judgment condemning the interpretation of the regulation applied by the agents as being an unconstitutional application thereof and seeks an injunction prohibiting the agency from future prosecution of the plaintiff for the same or similar activities.

Plaintiff's farming operations include 2,600 acres of contiguous farm land encompassing roughly a rectangular area, 5 miles in length from east to west and approximately 2 miles in width from north to south. Near the western end of plaintiff's farm is a natural depression or willow slough which holds water following winter rains and serves as a natural attraction as a resting area for waterfowl. In addition to the natural pond, plaintiff has developed other smaller impoundments in low spots or depressions on his farm and planted therein natural foodstuffs and agricultural crops, all of which is permitted under the regulation. In certain of the newly created areas which waterfowl failed to use or frequent even after flooding, the plaintiff has on occasions placed soybeans, rice, or corn in an attempt to encourage their use in order to develop a history of usage in hopes that the waterfowl in later seasons will return to such areas.

Two years prior to the incident in question, plaintiff bulldozed a lane or opening through a tract of hardwood timber situated in the east central portion of his farm and by erecting levies succeeded in flooding 50 to 60 acres of woods. However, ducks utilized this area only sporadically and in small numbers. Four to six weeks prior to January 31, 1980, plaintiff caused to be placed some two to three bushels of shelled corn at the south end of the bulldozed lane. Subsequently, Special Agent Jim Pilgreen, of the Fish and Wildlife Service, found this bait and other baits around plaintiff's ponds, other than the rest pond. Agent Pilgreen observed approximately 5,000 ducks moving back and forth between the rest pond and the remainder of plaintiff's property, including the locations of the bait. He continuously observed the activity of the ducks and the location of the bait on this property for a number of days and finally, on January 31, 1980, the last day of the duck season, plaintiff and his party hunted from two blinds located in the rest pond. As mentioned above, the actual loca-

tion of the hunters' blinds was approximately 3,700 feet from the bait deposit, but Agent Pilgreen observed that during the two or three weeks preceding the date of hunting and the subject violation, the number of ducks using the ponds and flooded locations on plaintiff's property had substantially increased.

The court finds that without the bait placed on plaintiff's property at his direction, plaintiff would not have been able to retain a huntable population of ducks on his property. Plaintiff himself testified that hunting during the season prior to putting out his bait had been problematical. This fact is further verified by Agent Pilgreen's testimony that he returned to plaintiff's property during the following duck season and found no bait and an absence of ducks. Hence, the absence of bait was the only factor to explain the absence of ducks, since the water conditions were virtually the same the year of the violation and the following year.

The court heard testimony from four experts in waterfowl biology and two lay witnesses concerning habits of ducks and the effect of habitat environment upon their daily activities. All the witnesses generally agreed on the following points:

1. The necessary requirements for ducks are food, water, and protection.

2. If these requirements are provided in a relatively undisturbed environment, ducks will congregate in substantial numbers.

3. Ducks feed early and late, on a daily basis, and rest for the most part during the remainder of the day. The length of feeding periods will vary depending on weather conditions and whether or not the ducks are disturbed.

4. Ducks will expend only the necessary energy to obtain food in a suitable resting area. In other words, ducks will utilize the closest food source and rest area if otherwise undisturbed.

5. Plaintiff's rest pond was ideal for a large number of ducks, and it was the only suitable rest area within several miles.

6. The bait placed on plaintiff's property at several locations was the closest food source to the rest pond along with marginal natural food sources on his property and in the surrounding area.

The government presented three expert witnesses in waterfowl biology who testified that it was clear that the ducks taken by plaintiff on January 31, 1980, were within the zone of influence of the bait put out by plaintiff and that the bait was a lure, attraction, and enticement to hold the birds in the area so that they could be shot if they used the rest pond. These experts also testified that without the bait, the ducks would not have been so concentrated in plaintiff's rest area.

Another expert tendered by the government, Mr. Hall, had 19 years experience in enforcement of the federal migratory waterfowl regulations. At the time of the event in question, he was the regional supervisor for enforcement covering Mississippi, Louisiana, and Arkansas. Mr. Hall had participated in countless baiting violation investigations and testified over 200 times in baiting cases, as well as before a Congressional committee overseeing such regulations. Mr. Hall stated that the facts of the instant case made out a clear violation of that portion of the regulation that prohibited taking waterfowl with the aid of baiting. He explained that creating habitat, such as ponds or flooded areas, as well as artifically feeding ducks does not violate the regulation. However, if the hunter artifically feeds the waterfowl and hunts them anywhere within the zone of influence of the bait, he then violates the regulation.

■ The contested regulation is 50 C.F.R. 20.21(i), which provides that no person shall take migratory game birds:

(i) By the aid of baiting, or on or over any baited area. As used in this paragraph, "baiting" shall mean the placing, exposing, depositing, distributing, or scattering of shelled, shucked, or unshucked corn, wheat or other grain, salt, or other feed so as to constitute for such birds a lure, attraction or enticement to, on, or over any areas where hunters are at-

tempting to take them; and "baited area" means any area where shelled, shucked, or unshucked corn, wheat, or other grain, salt, or other feed whatsoever capable of luring, attracting, or enticing such birds is directly or indirectly placed, exposed, deposited, distributed, or scattered; and such area shall remain a baited area for 10 days following complete removal of all such corn, wheat, or other grain, salt, or other feed....

The regulation thus prohibits two different kinds of conduct: (1) taking migratory birds with the aid of baiting and (2) taking migratory birds on or over a baited area. *Clemons v. United States,* 245 F.2d 298 (6th Cir.1957); *United States v. Bryson,* 414 F.Supp. 1068 (D.C.Del.1976). It is the taking of migratory birds with the aid of baiting portion of the regulation that is the subject of the instant case.

Plaintiff challenges the regulation as unconstitutional on the grounds of vagueness in that the "taking with the aid of baiting" prohibition fails to adequately apprise an individual of what conduct is prohibited. The regulation in question was promulgated pursuant to the Migratory Bird Treaty Act (16 U.S.C.A. § 703 et seq.). This Act of Congress was in response to the Treaty between Great Britain and the United States in 1916 concerning Migratory Birds (39 Stat. 1702). The Supreme Court settled all questions as to the validity of the Treaty and the Act of Congress enacted pursuant to the Treaty. *Missouri v. Holland,* 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641 (1920); *Carey v. South Dakota,* 250 U.S. 118, 39 S.Ct. 403, 63 L.Ed. 886 (1919).

Plaintiff argues that the baited area has to constitute for the birds a lure, attraction, and enticement to, on, or over an area where hunters are attempting to take them. This is precisely what Agent Pilgreen observed when he testified "the larger concentrations or larger flights seemed to move east-southeast (from the rest pond in the direction of the baited area) in the morning and the reverse compass direction of that in the afternoon" (from the baited area back to the rest pond). In other words, plain-

tiff's placing of the bait even 3,700 feet from the shooting area served as a lure or attraction for more ducks to go to, on, or over an area where hunters were attempting to take them, i.e., the rest pond.

The United States Supreme Court made it perfectly clear in *United States v. Harriss,* 347 U.S. 612, 618, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1964), and in *Jordan v. De-George,* 341 U.S. 223, 231, 71 S.Ct. 703, 707–708, 95 L.Ed. 886 (1951), that the regulation does not have to itemize as legal or illegal every conceivable situation of hunting over farm land. A statute need embody only as much exactness as the subject matter permits. *United States v. Petrillo,* 332 U.S. 1, 7–8, 67 S.Ct. 1538, 1541–1542, 91 L.Ed. 1877 (1947). Furthermore, a court must seek an interpretation which supports the regulation's constitutionality. *United States v. Rumely,* 345 U.S. 41, 73 S.Ct. 543, 97 L.Ed. 770 (1963).

In *Cerritos Gun Club v. Hall,* 96 F.2d 620 (9th Cir.1938), the plaintiffs brought a bill in equity to enjoin federal officers from prosecuting them for luring, with grain, migratory game fowl to their properties, there to be shot. The regulation then in effect prohibited the taking of "... waterfowl ... by means, aid, or use, directly or indirectly, of corn ... or other grain products ... placed, deposited, distributed, scattered, or otherwise put out whereby such waterfowl ... are lured, attracted or enticed." It is noted that this regulation is quite similar to the present existing regulation now in question.

The plaintiffs argued that the regulation, with its criminal sanction, was invalid because it was too vague and uncertain to advise the offender of the offense. The trial court dismissed the action, and the appellate court affirmed in a lengthy decision based in part on the theory that this was a proper area for Congressional action under the commerce clause of the Constitution. Pertinent excerpts appear on pages 624–629 as follows:

We believe the appellants here violated the Secretary's regulation whether by pursuing the indirect method of baiting

before the season opens to keep the birds there to be shot after the season opens, so that hunters may flush them as they walk or hunt over the preserves, or by directly placing the grain in front of the blinds or stands during the season. Wherever the grain is placed on the preserves, the wind will create lines of the birds' flight, to and from it, which will aid the slaughter from blinds located for the purpose.

\* \* \* \* \* \*

One of the principal methods of luring of birds into special areas to be hunted is the feeding of those areas, and such feeding, whether it be in front of a particular blind or by scattering over a wider area, whether "directly or indirectly" within the terms of the considered regulation, contributes greatly to the slaughter of their constantly diminishing quantity.

\* \* \* \* \* \*

Nor is there weight in appellants' contention that there is such vagueness in terms " \* \* \*  Not permitted to be taken by means, aid, or use, directly or indirectly, of corn, wheat, oats, or other grain or products thereof, salt, or any kind of feed whatsoever, placed, deposited, distributed, scattered, or otherwise put out whereby such waterfowl or doves are lured, attracted, or enticed, \* \* \* that the offenders are not properly advised of the offense.  Common sense discloses exactly what these words mean; it being held that "indirectly" clearly applies to *any* luring by grain of the birds to the hunting areas, regardless of whether the grain is spread before particular blinds or more widely scattered.

In *United States v. Delahoussaye,* 573 F.2d 910 (5th Cir.1978), this circuit rejected a constitutional attack on the "baited area" part of the regulation.  In *Delahoussaye,* defendants charged with taking ducks "on or over a baited area" claimed that they did not know that the corn used as bait was present, and that "area," as used in the regulations, was unconstitutionally vague. In rejecting these contentions, the Fifth Circuit held:

The "area" intended by the quoted regulations is rather plainly that within and over which the bait or the callers exercise an attraction.  Since these are forbidden means of taking ducks, the area within which but for them ducks would not be is one forbidden to hunters.  It is true that such an area is not subject to exact definition and may expand or contract with changes of wind and weather, but hunters must make many such judgments as these in order to hunt at all.  Any other definition would be ineffective to deny the advantage of the prohibited means to hunters inclined to seek it, and we think that, in prohibiting hunting "by the aid" of these means, the regulations plainly call for such a definition in terms comprehensible to the average reader.  It is also true that there will be dubious zones at the area's edges but this circumstance requires no more than that hunters resist the temptation to sail close to the wind.

■ In the instant case, plaintiff offered no evidence of vagueness and, therefore, he urges the court to find the regulation unconstitutional as a matter of law.  The court notes that the baiting regulation has been in force, with substantially the same language, since 1935 and although challenged on occasion, no court has found its provisions to be unconstitutionally vague.

■ Likewise, it is abundantly clear under the facts of this case that the agents of the Fish and Wildlife Service did not act arbitrarily, without reason, or in the absence of probable cause in citing plaintiff for violating the "taking with the aid of baiting" portion of the regulation.

Agent Pilgreen found the bait at several locations on plaintiff's property.  He observed the ducks' behavior in relation to the location of the bait and the rest pond.  He flew over the property and took aerial photographs.  He observed plaintiff's hunting on the day in question, including the ducks flight pattern in relation to the bait.  He determined that plaintiff was taking the waterfowl with the "aid of baiting."  His decision is substantiated by the expert testi-

mony that the bait so placed by plaintiff was a lure or attraction to the ducks and that ducks taken at the rest pond site were within the zone of influence of the bait.

In *Cochrane v. United States,* 92 F.2d 623, 628 (7th Cir.1937), the court stated:

Naturally much was left to the administrative officer who was charged with the enforcement of the law, the protection of the birds, and the regulation of duck hunting. His action in turn is and must be dependent upon past experiences, the statistics dealing with the plentifulness of ducks and geese and other migratory birds, and finally, but not least, upon the sportsmen themselves and the code of ethics which they promulgate and enforce.

In most "baiting" cases, knowledge of the bait's existence is usually an issue. However, it is uncontested in the instant case that plaintiff ordered the bait put out on his property. Thus, the reasoning of *United States v. Bryson,* 414 F.Supp. 1068, 1073 (D.C.Del.1976), is particularly appropriate here. In *Bryson,* the district court stated that once it was shown that the hunter had something to do, directly or indirectly, with the placing of the bait, the hunter hunts at his own peril. The *Bryson* court observed:

It is important to know that if the government makes this showing, it does not matter how far away from the bait the hunter is located. He is guilty even if the bait is miles away so long as it served to lure the birds "to, on, or over" the place where the hunter was attempting to take them. In short, if a hunter has something to do with the placing of the bait, he may not lawfully take migratory birds anywhere within the "zone of influence" of that bait.

In the instant case, plaintiff and the other hunters positioned themselves in blinds in the rest area pond which concededly was not baited. Further, the bait placed by plaintiff was some 3,700 feet away from where plaintiff and his party were actually shooting the ducks. However, the court finds that by placing the bait even a distance of 3,700 feet away from the blinds in the rest area pond, this served to lure the birds "to, on, or over" the place where the hunters were taking them. In other words, the placing of the bait significantly increased the duck population in the rest area pond, and this increase of population was accomplished "by the aid of baiting" which is the very act 50 C.F.R. 20.21(i) forbids.

■ If this court were to sustain plaintiff's position, it would have the effect of striking down the "by the aid of baiting" portion of the regulation and thereby judicially rewriting the regulation, severely crippling enforcement of the baiting regulation. It is clear that the regulation's intent is to reach all ways that a hunter attempts to take waterfowl where bait is used to influence, directly or indirectly, the birds presence at a place where the hunter attempts to take them. The regulation is, therefore, necessarily broad because the illegal use of bait is only limited by the baiter's ingenuity and the biological responses of waterfowl. Since plaintiff provided water and protection for waterfowl on his property, in a controlled environment, and put out food in the form of bait, and thereafter hunted ducks at the rest area, it seems clear from the evidence that the waterfowl taken at the rest pond were within the zone of influence of the bait and plaintiff therefore violated the regulation.

In summary, plaintiff's constitutional attack on the regulation for vagueness must fail as plaintiff has not sustained his burden of proof that, under these facts, the regulation does not apply to him. Indeed, it seems clear that it is the factual situation and hunting method such as is before this court that the regulation intended to prohibit. For these reasons, plaintiff's request for a declaratory judgment and injunctive relief will be denied and judgment entered for the defendant dismissing the complaint herein.